UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:25-cr-00103-LEW |
| | ) | |
| JOSEPH AUGER, | ) | |
| | ) | |
| Defendant | ) | |

**ORDER ON DEFENDANT'S MOTION TO SUPPRESS**

This matter is before the Court on Defendant Joseph Auger's Motion to Suppress (ECF No. 43) statements that he made during the interrogation that followed his arrest. For the following reasons, the Defendant's Motion is DENIED.

**BACKGROUND**

On April 24, 2025, law enforcement posted an advertisement online entitled "Portland girl looking for fun!" and displaying a young female posed suggestively. At 12:27 p.m., law enforcement received a response to the advertisement from a phone number with a 603 area code. An officer (undercover) responded that the advertisement was for her 14-year-old sister "Emma." The 603 number responded that he would not "meet up with a 14 yr old" and ended the conversation at 12:40 p.m. At 12:47 p.m., law enforcement received another response to the ad from a phone number with a 207 area code. The officer responded again that the advertisement was for her 14-year-old sister, "Emma," and listed prices. The conversation between the undercover officer and the 207 number continued throughout the afternoon.

Eventually, the 207 number asked where "Emma" and her "sister" were located, and the officer provided the address of a hotel. At 4:53 p.m., the 207 number messaged: "Here." The officer sent parking directions and a hotel room number. Shortly thereafter, Defendant arrived at the designated hotel room. An undercover officer answered the door and asked Defendant if he was there to see "Emma." He confirmed that he was. Defendant handed the agent some cash, and she gave him a key to the adjoining room, where "Emma" was waiting. As Defendant walked to "Emma's" room, he "was taken down at gunpoint by a squad of heavily harmed" officers, "outfitted head to toe in body armor and tactical gear." Mot. at 2-3. He was ordered to lie face down on the sidewalk while an officer pointed a firearm at the back of his head. *See* Def. Ex. 1. He was handcuffed, searched, and taken into custody.

Maine State Police Sergeant Christopher Cookson then brought Defendant into a conference room in the hotel, where South Portland Police Department Detective Frank Stepnick and Homeland Security Investigations Special Agent Eric Tracy read him his *Miranda* rights and presented him with a waiver form. The interrogation of Defendant by Det. Stepnick and S.A. Tracy that followed was audio-recorded. *See* Gov't Exs. 1, 2.

S.A. Tracy sat next to Defendant so they could review the Statement of Rights form together, while Det. Stepnick sat across the table. Everyone remained in these positions for the duration of the interview. At the beginning of the interview, S.A. Tracy acknowledged that Defendant was under arrest, but told him that as a person who had been arrested, he had rights. He explained that "some of those rights are called Miranda rights, and we have this Statement of Rights form that we read out to you." Gov't Ex. 1, 1:35-45.

He told Defendant to let him know if he did not understand anything, and that they would go over it again. S.A. Tracy then read the form aloud, telling Defendant:

(1) That he had the right to remain silent;

(2) That anything he said could be used against him in a court of law or other proceedings;

(3) That he had the right to consult an attorney before making any statement or answering any questions;

(4) That he had the right to have an attorney present with him during questioning;

(5) That if he could not afford an attorney, one would be appointed for him before any questioning if he wished; and

(6) That if he decided to answer questions, he would still have the right to stop the questioning at any time or stop questioning for the purpose of consulting an attorney.

After reading each line on the form, S.A. Tracy paused and asked Defendant if he understood. Defendant confirmed that he did. S.A. Tracy then read the waiver clause aloud and asked Defendant to print his name, sign, and date the form. Defendant asked if he could stop at any time, and S.A. Tracy responded, "Anytime, yeah." *Id*. 2:52-58. They removed Defendant's handcuffs. Det. Stepnick told Defendant that they were not looking to make life difficult for him, and that everyone makes mistakes. Defendant acknowledged that his life would be very different now, and Det. Stepnick apologized for that. Det. Stepnick again reassured Defendant that he was not there to judge him, that everyone makes mistakes, and that he just wanted to find out what was going on. Gov't Ex. 1, 3:55-4:21. S.A. Tracy repeated that Defendant could stop the interview whenever. Defendant signed and dated the waiver. *See* Gov't Ex. 3.

3

Over the next fifty minutes or so, S.A. Tracy and Det. Stepnick asked Defendant questions about his background and the events leading up to his arrest at the hotel. Defendant complied, answering all of the investigators' questions in a calm and respectful tone. Defendant repeatedly denied that he intended to have sex with the 14-year-old when he arrived at the hotel, explaining that he intended to help her. The investigators repeatedly explained why—in light of his text messages (from both phone numbers), the $150 in his pocket, and his failure to contact police on the girl's behalf—they did not believe that was true, while also professing to understand his reluctance to admit it. During the course of that interview, Defendant made statements that, in his words, "could be construed by a factfinder as admissions of culpability," Mot. at 2, and consented to the search of his cell phone,[1] *see* Gov't Ex. 1, 38:07-42:05; Gov't Ex. 4.

S.A. Tracy and Det. Stepnick terminated the interview when they ran out of questions. The entire interview lasted approximately one hour. At no point during that hour did investigators raise their voices, make any threats or promises to induce a confession, or treat Defendant with anything other than courtesy and professionalism. Defendant, for his part, showed no signs of being in distress, and maintained a polite and respectful tone throughout the interrogation.

---

[1] Approximately 40 minutes into the interview, S.A. Tracy told Defendant they would be seizing his phone and planned to apply for a warrant to search it. "We can go that route," S.A. Tracy explained, "There's also the route where—you're saying there's nothing on it, if you want to consent to us looking through the phone, we can go that route as well. Those are basically the two options today." Gov't Ex. 1, 38:07-38:28. Defendant responded, "I'll open the phone to you." *Id*. 38:28-33. While S.A. Tracy looked for a consent form, Det. Stepnick engaged Defendant in conversation about his job. S.A. Tracy returned with the consent form and reviewed it with Defendant, reading it aloud, pausing frequently to confirm that Defendant understood, and providing further explanation when it appeared he did not. *Id*. 40:31-42:05. Defendant answered S.A. Tracy's questions about his device and provided the passcode. Then he signed the consent form. *See* Gov't Ex. 4.

Defendant alleges that Det. Stepnick and S.A. Tracy "deploy[ed] a classic 'Reid Interview' technique, by both minimizing the Defendant's actions and culpability . . . and subsequently confronting the Defendant with their doubts concerning his veracity and true motives." Mot. at 2. Defendant maintains that as a result, any incriminating statements he made during that interrogation—including his consent to search his phone—were the product of coercion and must be suppressed.

## DISCUSSION

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny, law enforcement must "provide warnings concerning certain Fifth Amendment rights—including the right to remain silent and the right to consult an attorney—before interrogating a suspect in a custodial setting." *United States v. Carpentino*, 948 F.3d 10, 20 (1st Cir. 2020). Without these warnings, statements obtained through such interrogation will not be admissible against a defendant at trial. *Id*. A suspect who has been informed of his *Miranda* rights may choose to waive them, but that waiver "must be made knowingly, intelligently, and voluntarily." *United States v. Rang*, 919 F.3d 113, 117 (1st Cir. 2019). There are "two distinct dimensions" to this analysis:

> First, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." . . . Second, "the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*United States v. Donald*, 84 F.4th 59, 66 (1st Cir. 2023) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Courts examine "the totality of the circumstances surrounding the interrogation" to determine whether a defendant made "an uncoerced choice" and

possessed "the requisite level of comprehension." *Id*. Starting, as I must, "with a presumption that the suspect did not waive his rights," it is the Government's burden to prove the validity of the waiver by a preponderance of the evidence. *Carpentino*, 948 F.3d at 26.

Even if a defendant has been informed of and chosen to waive his *Miranda* rights, the Fifth Amendment separately requires the suppression of self-incriminating statements made involuntarily. *United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014). "In assessing whether a confession is voluntary, courts must inquire whether the will of the defendant had been overborne so that the statement was not his free and voluntary act." *Id*. This assessment also requires evaluation of the totality of the circumstances, including "the length and nature of the questioning, promises or threats made by investigators, and any deprivation of the suspect's essential needs," as well as the defendant's "demeanor and the lucidity of his statements" during questioning. *Id*. I am also instructed to consider the personal characteristics of the defendant, "including his age, education, and mental condition . . . as well as his prior experience with the criminal justice system." *Id*.

At the outset of the interrogation, S.A. Tracy provided Defendant with a form waiver that outlined Defendant's *Miranda* rights and read the form aloud to him. After reading each line, S.A. Tracy asked Defendant if he understood, which Defendant confirmed he did. Defendant signed the form, agreeing in writing to waive those rights. There is no evidence that his decision to do so was anything other than knowingly, intelligently, and voluntarily made. *See Carpentino*, 948 F.3d at 26 (under similar circumstances, written waiver was "strong evidence of the knowing and voluntary nature

of the defendant's relinquishment of his *Miranda* rights"). While I can see how being unexpectedly arrested at gunpoint by several heavily armed law enforcement officers in full tactical gear could be an unsettling experience, to say the least, I see no evidence that this experience—though close in time to Defendant's interrogation—had any effect on the voluntariness of his waiver. Defendant did not show any signs of physical or mental distress when he agreed to waive his rights. Nor is there any indication that Defendant even attempted to invoke his rights, terminate the interview, or otherwise rescind the waiver of his rights at any point after the interrogation began.

Having voluntarily waived his *Miranda* rights, Defendant's only remaining argument is that his will was overborne by a coercive interrogation. All signs point against this conclusion. The entire interrogation lasted under an hour. S.A. Tracy and Det. Stepnick maintained a calm and professional tone the entire time. They made no promises or threats. There is no indication Defendant's essential needs went unmet during questioning or that Defendant was in any kind of physical or emotional distress. His demeanor was "calm" and "level-headed" and his statements were lucid. *Jacques*, 744 F.3d at 809 ("A defendant's calm demeanor and the lucidity of his statements weigh in favor of finding his confession voluntary."). He was assured—and confirmed he understood—that he could terminate the interview at any point, but he never did. Defendant emphasizes his lack of prior experience with the criminal justice system and seems to suggest this inexperience made him vulnerable, *see* Mot. at 3 n.1, but there is simply no indication here that Defendant was anything more than flustered or nervous at any point during the interview. Defendant holds a bachelor's degree and was in his late

twenties at the time of his arrest. *See id*. Nothing about his age, mental condition, or education level suggests that he was particularly vulnerable to law enforcement coercion. To the contrary, during the interview, Defendant appeared to appreciate the seriousness of his situation and the consequences he faced.

Defendant argues that S.A. Tracy and Det. Stepnick "employed a classic Reid interrogation technique." Mot. at 3. As an initial matter, this point is very much in doubt.[2]

---

[2] Defendant does not elaborate on what this interrogation technique consists of beyond what is laid out above. As the Government points out in its response, a U.S. District Judge in Rhode Island summarized the technique in a 2017 opinion as follows:

> The Reid Technique is the most-used interrogation technique by law enforcement in the United States. John E. Reid & Associates, Inc., the developer of the technique, traces its origins to the 1940s. The method consists of a "Behavioral Analysis Interview" and an "Interrogation." The Behavioral Analysis Interview is largely intended "to determin[e] whether the suspect is lying, which is generally indicative of guilt." If, after the Behavioral Analysis Interview, the investigator feels that the suspect is not being truthful, an Interrogation generally follows. During the Interrogation, "the insistence on the suspect's guilt ... is to be hurled persistently and unwaveringly, and [is to] be accompanied by a flat and assertive rejection of the suspect's denials of guilt." During this process, "the interrogator must make the suspect perceive that confessing is the most beneficial course of action available to him." To achieve this, "the interrogator must distort [the suspect's] perception of the situation, namely by making confessing appear to be more advantageous than refusing to confess." To this end, "the Reid Method advocates the use of interrogative techniques that have been labeled <u>minimization</u> and <u>maximization</u>, which have been deemed permissible by" courts.

> Minimization involves

>> presenting the suspect with a <u>theme</u> that reduces the import of the crime. Themes usually convey the interrogator's opinion that the crime was not so serious, that the victim deserved his fate, or that anyone else would have acted in the same way. ... [E]xperiments show that minimizing themes are understood by lay people as implicit promises of leniency.

> Maximization, on the other hand, involves

>> depicting the case against the suspect as being beyond any doubt. The implicit message is that the suspect is bound to be convicted even absent a confession, and that he faces harsh consequences, especially given the seriousness of the criminal charge ... and the severity of the corresponding punishment .... Cooperating with the interrogators is portrayed as the only possible way to mitigate the direness of [the suspect's] situation.

But even assuming law enforcement used something resembling the Reid technique here, the First Circuit has made clear that this fact alone would not render Defendant's statements involuntary per se. *See Jacques*, 744 F.3d at 812 (concluding that a confession procured through the Reid technique was voluntary under all the circumstances); *see also United States v. Monroe*, 264 F. Supp. 3d 376, 390-94 (D.R.I. 2017). While "[e]xtreme forms of deception or chicanery by the police may be sufficient to render a confession involuntary," "a confession is not considered coerced merely because police misrepresented to a suspect the strength of the evidence against him" or "minimize[ed] the gravity of [the] offense." *Jacques*, 744 F.3d at 812. Neither the recordings of the interrogation, *see* Gov't Ex. 1 and 2, nor the testimony of the witnesses at the suppression hearing has adduced any evidence of "deception or chicanery" by S.A. Tracy or Det. Stepnick, *Jacques*, 744 F.3d at 812, or anything else that can be described as a "high-pressure" tactic, as Defendant claims, *see* Mot. at 4. Even if aspects of Defendant's interrogation could be described in "Reid" terms, there is simply no evidence that his will was overborne as a result.

---

*United States v. Monroe*, 264 F. Supp. 3d 376, 391 (D.R.I. 2017). At the hearing, S.A. Tracy and Det. Stepnick both disclaimed familiarity with the Reid technique and denied using it here. Det. Stepnick testified that he had learned about the Reid technique in either 2002 or 2006, but has never used it, to his knowledge. He testified that he tries to handle defendants in certain cases gently, because he views them as at an increased risk for self-harm, and described his "methodology"—to the extent he had one—as the product of on-the-job training and experience. S.A. Tracy testified that he had never been trained in or used the Reid technique, but that he had been trained in a method he called "Strategic Use of Evidence," which involves, as he described it, starting with more open-ended or general questions that become increasingly specific and targeted over the course of the interview, before finally confronting the suspect with the evidence against him.

## CONCLUSION

Defendant's Motion to Suppress (ECF No. 43) is DENIED.

SO ORDERED.

Dated this 17th day of July, 2026.

/s/ Lance E. Walker
Chief U.S. District Judge